### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTOPHER AUTHIER, | |
| Plaintiff, | |
| v. | Action No.:    26-cv-10122-DJC |
| LEAGUE CORP., | |
| Defendant. | |

### DEFENDANT LEAGUE CORP.'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT AND JURY DEMAND

Defendant League Corp., ("League") responds to the allegations set forth in the Complaint and Jury Demand filed by Plaintiff Christopher Authier ("Plaintiff") (together the "Parties") and asserts its Affirmative Defenses as follows:

### PARTIES

1.      On information and belief, admitted.

2.      League admits to the allegations set forth in Paragraph 2 of the Complaint.

### JURISDICTION AND VENUE

3.      Paragraph 3 of the Complaint sets forth a legal conclusion to which no response is required. To the extent a response is required, League admits only that it does not contest subject matter jurisdiction at this time based on the set of facts presently known and available.

4.      League lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 4 of the Complaint and therefore denies them.

5.      League admits to the allegations set forth in Paragraph 5 of the Complaint.

6.      League admits that Plaintiff was to receive a base salary and commissions based on sales. League denies the remainder of the allegations set forth in Paragraph 6 of the Complaint.

7.      League denies the allegations set forth in Paragraph 7 of the Complaint because they purport to summarize and/or characterize the terms of the "Sales Bonus Program FY'22," the terms of which speak for themselves. League denies any remaining allegations set forth in Paragraph 7 of the Complaint.

8.      League denies the allegations set forth in Paragraph 8 of the Complaint.

9.      League denies the allegations set forth in Paragraph 9 of the Complaint because they purport to summarize and/or characterize the terms of the "Sales Bonus Program FY'23," the terms of which speak for themselves. League denies any remaining allegations set forth in Paragraph 9 of the Complaint.

10.     League denies the allegations set forth in Paragraph 10 of the Complaint.

11.     League denies the allegations set forth in Paragraph 11 of the Complaint.

12.     League denies the allegations set forth in Paragraph 12 of the Complaint.

13.     League denies the allegations set forth in Paragraph 13 of the Complaint.

14.     League denies the allegations set forth in Paragraph 14 of the Complaint.

15.     League admits that, on December 9, 2025, it presented Plaintiff with a severance document indicating a termination date of Plaintiff's employment on December 18, 2025. League denies the remainder of the allegations set forth in Paragraph 15 of the Complaint.

16.     League admits that Plaintiff served a demand letter on December 10, 2025. League denies the remainder of the allegations set forth in Paragraph 16 of the Complaint.

17.     League admits that Plaintiff was terminated on December 17, 2025 because he had taken League's confidential information. League further admits that Plaintiff's computer access

was disconnected immediately. League denies the remainder of the allegations set forth in Paragraph 17 of the Complaint.

18.     League denies the allegations set forth in Paragraph 18 of the Complaint because they purport to summarize and/or characterize League's response to Plaintiff's demand letter, the terms of which speak for themselves. League denies any remaining allegations set forth in Paragraph 18 of the Complaint.

19.     League denies the allegations set forth in Paragraph 19 of the Complaint because they purport to summarize and/or characterize League's response to Plaintiff's demand letter, the terms of which speak for themselves. League denies any remaining allegations set forth in Paragraph 19 of the Complaint.

20.     League admits that on December 17, 2025, it arranged for the retrieval of Plaintiff's laptop computer and delivered Plaintiff his termination letter. League denies the remainder of the allegations set forth in Paragraph 20 of the Complaint.

21.     League denies the allegations set forth in Paragraph 21 of the Complaint.

## CAUSES OF ACTION

### COUNT I
### UNPAID WAGES

22.     League incorporates its responses to the preceding paragraphs as if fully set forth herein.

23.     League denies the allegations set forth in Paragraph 23 of the Complaint.

24.     League denies the allegations set forth in Paragraph 24 of the Complaint.

25.     League denies the allegations set forth in Paragraph 25 of the Complaint.

26.    Paragraph 26 of the Complaint sets forth a legal conclusion to which no response is required.    To the extent a response is required, League denies the allegations set forth in Paragraph 26 of the Complaint.

## COUNT II
## RETALIATION

27.    League incorporates its responses to the preceding paragraphs as if fully set forth herein.

28.    League denies the allegations set forth in Paragraph 28 of the Complaint.

29.    League admits that it sent Plaintiff a severance letter stating that he would be terminated on December 18, 2025. League further admits that it disconnected Plaintiff's access to his computer. League denies the remainder of the allegations set forth in Paragraph 29 of the Complaint.

30.    Paragraph 30 of the Complaint sets forth a legal conclusion to which no response is required.    To the extent a response is required, League denies the allegations set forth in Paragraph 30 of the Complaint.

## COUNT III
## BREACH OF CONTRACT

31.    League incorporates its responses to the preceding paragraphs as if fully set forth herein.

32.    League denies the allegations set forth in Paragraph 32 of the Complaint.

33.    League denies the allegations set forth in Paragraph 33 of the Complaint.

34.    League denies the allegations set forth in Paragraph 34 of the Complaint.

35.    Paragraph 35 of the Complaint sets forth a legal conclusion to which no response is required.    To the extent a response is required, League denies the allegations set forth in Paragraph 35 of the Complaint.

## COUNT IV
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

36.     League incorporates its responses to the preceding paragraphs as if fully set forth herein.

37.     Paragraph 37 of the Complaint sets forth a legal conclusion to which no response is required.

38.     Paragraph 38 of the Complaint sets forth a legal conclusion to which no response is required.  To the extent a response is required, League denies the allegations set forth in Paragraph 38 of the Complaint.

39.     Paragraph 39 of the Complaint sets forth a legal conclusion to which no response is required.  To the extent a response is required, League denies the allegations set forth in Paragraph 39 of the Complaint.

## <u>AFFIRMATIVE DEFENSES</u>

League asserts that Plaintiff's claims against it should be denied, in whole or in part, by the defenses set forth below. League has not knowingly or intentionally waived any applicable affirmative defense and reserves the right to assert and rely on other applicable affirmative defenses as may later become available or apparent.  League further reserves the right to amend its answer and/or affirmative defenses accordingly and/or to delete affirmative defenses that it determines are not applicable during the course of subsequent discovery.

## <u>FIRST AFFIRMATIVE DEFENSE</u>

Plaintiff's claims against League should be dismissed, in whole or in part, for failure to state a claim upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims against League should be dismissed, in whole or in part, because League has complied with all applicable statutes, regulations, and contracts.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims against League should be dismissed, in whole or in part, because the claims are barred by the doctrines of unclean hands, laches or estoppel.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims against League should be dismissed, in whole or in part, because the Plaintiff has failed to mitigate his damages.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because at all relevant times, League acted in good faith toward Plaintiff, and any actions taken towards Plaintiff were the result of legitimate, non-discriminatory, and non-retaliatory business reasons which were not pretextual.

## SIXTH AFFIRMATIVE DEFENSE

At all relevant times, League maintained reasonable, written policies against harassment, discrimination, and retaliation as well as an effective written, internal complaint investigation and resolution procedure. Plaintiff was aware of League's policies and procedures but did not utilize these procedures.

## SEVENTH AFFIRMATIVE DEFENSE

To the extent Plaintiff suffered damages as alleged, such damages were caused or contributed to by Plaintiff's own actions or actions of others over whom League exercises no control.

## EIGHTH AFFIRMATIVE DEFENSE

League's actions toward Plaintiff were taken for good cause and in good faith and were based on reasonable factors other than Plaintiff's alleged protected conduct.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the applicable statute of limitations.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or limited by set-off as League overpaid Plaintiff commission amounts.

## JURY DEMAND

League demands trial by jury on all issues so triable.

**WHEREFORE**, having fully listed its defenses and having fully answered the Complaint, League prays as follows:

(a) That judgment be entered in favor of League and against Plaintiff on the Complaint;

(b) That the costs of this action, including attorneys' fees, be assessed against Plaintiff; and

(c) That the Court grant such other and further relief as it may deem just and proper.

## COUNTERCLAIM AND JURY DEMAND

Defendant League Corp. ("League") hereby counterclaims against Plaintiff Christopher Authier ("Plaintiff").

## THE PARTIES

1.      League is a Delaware corporation with a principal place of business in Chicago, Illinois. During the term of Plaintiff's employment, League maintained an office in Chicago, Illinois.

2.      On information and belief, Plaintiff is an individual residing in Newburyport, Massachusetts.

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as the matter in controversy exceeds $75,000, exclusive of interest, attorneys' fees and costs, and there is diversity of citizenship between the parties.

4.      The Court has personal jurisdiction over Plaintiff pursuant to M.G.L. Ch. 223A § 2 as he is an individual domiciled in the Commonwealth of Massachusetts.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to League's claims occurred within this judicial district.

## STATEMENT OF FACTS

### A.  LEAGUE IS THE INNOVATOR OF A MODERN DIGITAL HEALTHCARE EXPERIENCE PLATFORM.

6.      League is a healthcare technology company focused on developing an AI-powered healthcare consumer platform (also known as a healthcare CX platform) that assists users to understand healthcare benefits, engage with healthcare programs, access services and providers, and make informed decisions about care through a personalized digital experience.

7.      As a result of a significant investment of time, attention and resources, including a significant amount of research and development costs, League developed a unique and one-of-a-kind digital platform that combines artificial intelligence, data integration, and a customizable user

interface and digital experience to create a tool that patients, providers and insurers can use to understand and navigate health benefits, locate healthcare providers, and support patient health goals by using behavioral science principles to motivate action. League's platform uses a proprietary artificial intelligence system that allows users to input healthcare related questions in natural and conversational language to deliver targeted and informational content, thereby reducing confusion and call volume. The platform also integrates with multiple health data sources and systems, allowing healthcare organizations to launch full digital health experiences or embed individual modules into existing systems.

8.    League has expanded substantial time, labor and financial resources to research and develop technical and business information and know-how regarding its products and services that have significant economic value, are not publicly known or readily ascertainable by proper means, and are maintained by League as confidential, proprietary trade secret information (individually and collectively referred to as the "League Trade Secrets").

9.    The League Trade Secrets include: (i) any and all versions of its proprietary CX digital platform, including software, related algorithms, concepts, data, health-related information, graphics, designs, images, audio and visual content, flowcharts, programming techniques, integrated circuits, specifications and source code listings; (ii) League's strategies and techniques to design and develop the proprietary CX digital platform; (iii) information regarding League's business operations, methods and practices, including marketing and advertising strategies, product pricing, margins, wages, salaries and hourly rates for staff, budgets, forecasts, analyses, financial results, bids, and services; (iv) data regarding League's customers and suppliers, including the names, addresses and other identifying information, market data, sales and purchasing history and preferences; (v) technical and business information pertaining to League's

clients and suppliers that League gathered and compiled in order to provide product and services; and (vi) intellectual and industrial property belonging to League, including but not limited to, software, design, and schematics, and all technical expertise and know-how with respect to the products and services offered by League. The League Trade Secrets are the result of a significant investment of time, effort, money and resources and have remained confidential at all times.

10.     The League Trade Secrets are contained and reflected in various documents maintained by League as confidential and proprietary, including:

a.  <u>2026 Strategic Plans</u>. This document contains details regarding League's strategy for increasing its domestic and international market share, leveraging its relationships with third party companies offering professional services to increase revenue, and proposed changes to its business model. This document also contains detailed information regarding League's sales, pipeline, key performance indicators, and territories.

b.  <u>Customer Activations and MAU</u>. This document contains detailed business information regarding a League customer gathered and created by League in the course of its business relationship with the customer.

c.  <u>League Connect 2026 Invites and Registration</u>. This document contains the names, address and contact information of League's customers.

d.  <u>League Platform Pricing Calculator</u>. A cost scenario modeling, including revenue and cost inputs and outputs. This document contains confidential financial and business information created and/or gathered by League regarding League's business model.

e.  <u>Sales Forecast & Pipeline Updates</u>.  A presentation of League's sales forecast, pipeline, metrics, performance indicators and overall strategy for increasing sales and revenue.

f.  "<u>Townhall</u>" Presentations. A League internal company meeting to discuss company strategy, finances, sales pipeline, customer delivery, including delays, issues, risks, and mitigation plans, updates on partnerships and engagement with government organizations, employee morale and company culture. The Townhall presentations are internal to League and external visibility poses significant risk and competitive harm to League. Further, candid discussions on the health and status of customer delivery involve sensitive customer scenarios that could damage customer trust and create reputational risk if disclosed outside of League.

11.     League holds legal and equitable title and is the rightful owner of the League Trade Secrets.

12.     The League Trade Secrets derive independent economic value from not being generally known or readily ascertainable through proper means by others who can derive economic value from the use or disclosure of the League Trade Secrets. Indeed, the League Trade Secrets would provide significant competitive value because their use or disclosure would reduce the time, effort, and cost required to develop a competing product, accelerate research and development, and guide competitors away from unproductive development paths.

13.     League has implemented and enforced several measures to protect the confidentiality of its proprietary and trade secret information, including the League Trade Secrets. For example, League has implemented and maintains a comprehensive Information Security Program (ISP) aligned with industry standards to protect the secrecy of its confidential and proprietary information, including League Trade Secrets. League's governance includes written policies and procedures limiting access to confidential and proprietary information, including the League Trade Secrets, to authorized personnel with a specific business need-to-know. League stores confidential and proprietary information, including the League Trade Secrets, in secure systems protected by unique user identifications and mandatory multi-factor authentication. To further safeguard its confidential and proprietary information, including the League Trade Secrets, League utilizes Mobile Device Management software and employs encryption standards to secure sensitive information. League also maintains continuous logging and monitoring of system access and activity to ensure ongoing compliance with its security policies.

14.     League operates a hybrid work environment authorizing personnel to work remotely. To secure this distributed workforce, League enforces a "Clear Desk and Clear Screen"

11

standard and prohibits the use of personal devices for accessing confidential information. Remote access is secured through mandatory full disk encryption on all endpoints, the use of virtual private networks or secure private networks, and multi-factor authentication for all accounts. League maintains physical office locations secured by electronic badge access systems. Access is restricted to authorized personnel, and all visitors are required to check in with reception prior to entry. League's physical and remote security environments are governed by written policies, including the Information Technology & Electronic Use Policy, which restricts access from high-risk geographic locations.

15.    League also requires employees to adhere to procedures and policies regarding the protection of its confidential and proprietary information, including the League Trade Secrets. For example, employees are prohibited from disclosing League's confidential and proprietary information, including the League Trade Secrets, to any unauthorized third party. Employees are also bound by League's Information Security Policy, which requires employees to protect League's confidential and proprietary information, including the League Trade Secrets, from unauthorized use and disclosure.

16.    League further protects its confidential and proprietary information, including the League Trade Secrets, by requiring that third party business partners sign nondisclosure/confidentiality agreements.

### B. **THE TERMS OF PLAINTIFF'S EMPLOYMENT WITH LEAGUE.**

17.    Plaintiff was hired by League in September 2021 as its Regional Vice President of Sales. Plaintiff was treated well by League from the very start. He was offered a highly competitive compensation package and was granted 150,000 options.

18.     As a condition of his employment with League, Plaintiff accepted an Employment Offer letter dated June 29, 2021 (the "Offer Letter"), which set forth the terms and conditions of Plaintiff's employment with League. A complete and accurate copy of the June 29, 2021 Offer Letter is attached hereto as Exhibit A.

19.     Appended to the Offer Letter is a "Proprietary Rights Agreement," which sets forth Plaintiff's obligations to protect League's trade secrets, confidential and other proprietary information. A complete and accurate copy of the Proprietary Rights Agreement is attached hereto as Exhibit B.

20.     The Offer Letter, upon its execution, and the Proprietary Rights Agreement constitute the entire agreement between League and Plaintiff with respect to his employment. Exhibit A.

21.     Under the terms of the Proprietary Rights Agreement, Plaintiff agreed to "keep in strictest confidence and trust" League's confidential and proprietary information, including the League Trade Secrets, and was prohibited from disclosing, allowing access to, transmitting, or transferring any of this information to a third party.  Plaintiff was further prohibited from copying or reproducing League's confidential and proprietary information, including the League Trade Secrets.  Exhibit B, ¶ 2.

22.     Plaintiff also agreed to not use League's confidential and proprietary information, including the League Trade Secrets, except as required to perform his job duties and responsibilities while employed at League. Exhibit B, ¶ 3(b).

23.     Upon the end of his employment with League, Plaintiff was required to immediately return all materials containing League's confidential and proprietary information, including the League Trade Secrets, in his possession. Exhibit B, ¶ 3(c).

24.    Plaintiff's obligations with respect to the confidentiality, non-use and non-disclosure of League's confidential and proprietary information, including the League Trade Secrets, survived even after the end of his employment with League. <u>Exhibit B</u>, ¶¶ 2, 3.

25.    Furthermore, the League Code of Conduct, which every employee is obligated to read and acknowledge on a yearly basis, requires employees to comply with the terms of the Proprietary Rights Agreement. A complete and accurate copy of the League Code of Conduct is attached hereto as <u>Exhibit C</u>.

26.    The Offer Letter also required employees to act diligently and in good faith    . <u>Exhibit A</u>. Likewise, the League Code of Conduct provides that all employees are expected to act in the best interest of League, its customers and members/users and to avoid situations that create either a real or perceived conflict of interest.

**C.    <u>PLAINTIFF INITIATES AND PURSUES A CONCERTED CAMPAIGN TO EXTRACT ECONOMIC CONCESSIONS FROM LEAGUE FOR WHICH HE WAS NOT ENTITLED TO ALL THE WHILE ENGAGING IN CONDUCT CONTRARY TO HIS DUTIES OWED TO LEAGUE</u>.**

27.    In the months and weeks leading to Plaintiff's termination from League, Plaintiff engaged in a concerted campaign to extract enhanced economic benefits from League for which he was not legally or contractually entitled to using persistent demands to League leadership and strategic pressure tactics. Tellingly, at no point during his pressure campaign did Plaintiff claim – as he does now – that his commission payments were untimely under the pertinent compensation plans.

28.    Plaintiff's pressure campaign began sometime in 2022 shortly after he successfully closed on a deal, known as the "Highmark" deal, that generated substantial revenue for the company.

29.     Plaintiff's campaign – before it morphed into a more concerted and aggressive effort to extract large scale economic concessions – started off simple: he claimed that he was entitled to additional compensation aside from commissions earned on the Highmark deal even though he was the *highest earning non-executive employee* in the company in 2022 as a result of the commissions he had earned on that deal.

30.     Payment of commissions on the Highmark deal was governed by League's 2022 Commission Plan (the "2022 Plan"). The 2022 Plan provided that earned commissions would be paid in two installments: the first following execution of the sales contract with the client and the second due in the quarter following the "go live" date of the deal or when a certain percentage of the payments from the client were received, whichever occurred earlier.

31.     Consistent with the 2022 Plan, Plaintiff received the first installment of his commission payment in June 2022 following the execution of the sales contract with the client and the second installment on time and in accordance with the 2022 Plan.

32.     Though he received all the commissions owed to him for the Highmark deal, Plaintiff unreasonably and without justification demanded even more on the grounds that the Highmark deal was a significant revenue source for League and that he should be rewarded (at least financially) for his role in closing the deal. He also conceded that the 2022 Plan – while "fair" – did not align with his personal "family goals."

33.     Plaintiff was a strong salesperson and, though it did not have a legal or contractual obligation to do so, League offered Plaintiff in good faith several retention payments following the Highmark deal designed to keep him satisfied, engaged and motivated as a high-performing salesperson.

34.     Furthermore, in direct response to Plaintiff's expressed dissatisfaction with the 2022 Plan, League's executive leadership proactively engaged in a comprehensive, good-faith consultation process to address his concerns. Although League had no legal or contractual obligation to modify the terms of the existing 2022 Plan – under which Plaintiff had already been fully and timely compensated – leadership elected to consult with both the Plaintiff and others in the industry to ensure Plaintiff's compensation remained competitive. This extensive effort culminated in the development and implementation of League's 2023 Commission Plan (the "2023 Plan"), which featured significantly higher base rates and lucrative new accelerators specifically designed to incentivize and retain the Plaintiff. These voluntary, good-faith actions by League marked the beginning of a consistent pattern of supporting Plaintiff's financial goals well beyond the requirements of his employment agreement.

35.     In May 2023, League offered Plaintiff an additional bonus as a (more than substantial) token of appreciation for Plaintiff's contributions to League, especially his performance on the Highmark deal.

36.     This was despite the fact that Plaintiff had received commissions for another deal – "the Optum Deal" – in excess of what he was owed under the 2023 Plan. More specifically, under the terms of the Optum Deal, League received platform fees that gradually increased over the term of the contract (4 years total). However, the customer also retained the option of terminating the contract with a 90-day notice to League. The contract underwent two material re-negotiations, finalized via two separate amendments, but Optum retained the option to terminate the contract with a 90-day notice. Plaintiff received commissions for contract year three in the midst of the second renegotiation of the contract and knowing that there was a risk that the fees for that year received by League would be reduced. The client ultimately exercised its termination

notice before the start of contract year three and no fees were paid to League as a result. League retains the right to clawback the commissions paid out to Plaintiff, as a result of the termination of the Optum contract.

37.    Yet, Plaintiff remained unhappy and unsatisfied (or at least gave the appearance that he was unhappy and unsatisfied) and demanded even more. Motivated once again by the good faith desire to retain and satisfy a strong sales performer, League offered to make certain favorable modifications to Plaintiff's 2023 compensation structure on an exceptional basis to enable him to access higher commission rates and accelerators. Specifically, League offered Plaintiff a "Special Discretionary Bonus Program" under which he was eligible to receive an additional, incremental bonus in the amount of $550,000 if he attained the qualifying amount of bookings set forth under the program.

38.    The Special Discretionary Bonus Program was enough to entice Plaintiff and he remained placated for some time. Then, in September 2024, when he failed to meet the qualifying amount of bookings to receive a bonus, Plaintiff reverted to the same pressure tactics and demanded more compensation claiming that the bonus program, which he was once satisfied with, was no longer sufficient to retain him.

39.    As a final effort to retain a strong sales performer, League offered Plaintiff a one-time retention bonus, while making clear that it would not entertain further compensation requests related to a deal that had closed more than two years earlier and for which Plaintiff had already been more than adequately compensated for.

40.    Having reached the end of his efforts to obtain unjustified and unwarranted economic concessions from League, Plaintiff accepted the one-time retention bonus as the final

offer League would make with respect to Highmark, satisfying his personal view that the deal warranted remuneration beyond the 2022 Plan.

41.     In November 2025, Plaintiff claimed to be "demotivated." Unassuaged by all that League had offered him up until that point, Plaintiff reassessed his approach and refined his strategy. This time, Plaintiff engaged in a two-sided, duplicitous ultimatum campaign for League to either (a) promote him several levels above his current position or (b) facilitate "a graceful transition" (*i.e.* termination without cause) from the company and receipt of a very favorable severance package. Plaintiff presented League management with a "Proposal for Role Alignment and Transition Options" outlining these two options in a "take it or leave it" type of deal and pushed League management for a quick decision regarding his demands**.** Plaintiff represented to the Vice President of People at League that he did not have other employment lined up.

42.     This later proved to be false, as League's internal investigation revealed that Plaintiff was already working for a competing company, Layer Health. Indeed, at the time Plaintiff was making his demands that he be promoted or else receive enhanced severance benefits, he had already accepted an offer of full-time employment from Layer Health and was merely trying to incite a "without cause" termination to trigger a favorable severance package.

43.     Plaintiff was also wasteful with company resources and consistently circumvented League's Expenses and Work Travel Policy by submitting duplicate hotel expenses, an expense for a personal spa treatment while on a business trip, and meal and in-room dining expenses in excess of the allotted per diem. When asked to provide itemized receipts of his expenses, Plaintiff would refuse and cite to "health risks" from BPA exposure from the receipt paper and "environmental concerns."

44.    By August 2025, Plaintiff had abandoned his responsibilities to League altogether. In fact, during the week of August 18, Plaintiff traveled to London without authorization and without requesting paid time off. Although Plaintiff represented that he was working remotely from London for the week of August 18, his League calendar reflects a detailed, hour-by-hour schedule of personal activities—including sightseeing, museum visits, shopping, and lunch reservations—during regular working hours. Throughout this period, Plaintiff continued to receive his full salary and benefits.

**D.  LEAGUE DISCOVERS THAT PLAINTIFF HAD EXFILTRATED DOCUMENTS AND INFORMATION PERTAINING TO THE LEAGUE TRADE SECRETS WHILE PERFORMING WORK FOR A COMPETITOR AND TERMINATES PLAINTIFF.**

45.    On December 11, 2025, League received a report from its internal security team that Plaintiff was engaging in suspicious activities on its system and servers inconsistent with his job duties and responsibilities beginning in September 2025 and continuing through December 2025.

46.    Specifically, Plaintiff accessed and downloaded a wide array of documents and files containing the League Trade Secrets, including all the documents set forth in Paragraph 10 above, without any legitimate business purpose for doing so.

47.    League's internal security team confirmed that within moments of making these unnecessary and unauthorized downloads, Plaintiff exfiltrated them for his own personal use without any authority to do so.

48.    Plaintiff's unlawful possession and disclosure of the League Trade Secrets could result in severe and irreparable harm to League, especially given that Plaintiff is employed with Layer Health, a competitor of League, offering artificial intelligence services to the healthcare industry.

49.    Furthermore, based on information and belief, from at least October 2025 (but possibly even sooner), Plaintiff downloaded and uploaded a number of documents from his personal email to his League workspace which confirmed that Plaintiff was engaged in an outside consulting role with Layer Health while he was still employed at League.

50.    Plaintiff's outside consulting activities during his employment were in direct violation of his contractual obligations set forth in the Offer Letter, Proprietary Rights Agreement and the Code of Conduct. Tellingly, Plaintiff refused to sign League's required annual acknowledgement of the Code of Conduct for the 2025 calendar year, although he had done so without issue in the past.

### COUNT I
### MISAPPROPRIATION OF TRADE SECRETS
### DEFEND TRADE SECRETS ACT
### 18 U.S.C. § 1836

51.    League incorporates each of the above paragraphs as if fully set forth herein.

52.    League owns and possesses certain confidential, proprietary and trade secret information as alleged above that derive independent economic value from not being known or readily ascertainable through proper means.

53.    The League Trade Secrets relate to products sold and services used, sold, shipped and/or ordered in, or intended to be used, sold, shipped, and/or ordered in, interstate or foreign commerce.

54.    League took reasonable measures to protect the secrecy and confidentiality of the League Trade Secrets including by imposing confidentiality and security policies, limiting access to the League Trade Secrets to authorized individuals with a business need to know, and imposing

other security measures such as password protection and encryption software that monitors application and data usage.

55.    Accordingly, the above-described information constitutes "trade secrets," under the Defend Trade Secrets Act, 18 U.S.C. § 1839, *et seq.*

56.    League's current and former employees are under a duty to maintain the confidentiality of the League Trade Secrets and are prohibited from disclosing, allowing access to, transmitting, or transferring any of this information to a third party.  Employees are further prohibited from copying or reproducing League's confidential and proprietary information, including the League Trade Secrets, and or using it for any purposes other than to perform job duties on behalf of League and in furtherance of its interests.

57.    Plaintiff accessed and downloaded a wide array of documents and files containing the League Trade Secrets, including, without limitation, the documents set forth in Paragraph 10.

58.    Plaintiff improperly and without authorization exfiltrated League's confidential and proprietary information, including the League Trade Secrets.

59.    Plaintiff has taken and retained the League Trade Secrets in an unauthorized fashion.

60.    Plaintiff engaged in this conduct while he was employed as an outside consultant for a competitor company, in express violation of his employment agreements with League.

61.    Plaintiff has used or intends to use the League Trade Secrets for his own benefit and/or for the benefit of his current employer, which is detrimental to League.

62.    Plaintiff's misappropriation of the League Trade Secrets was willful and malicious.

63.    As a direct and proximate result of Plaintiff's conduct, League has suffered and will continue to suffer severe competitive harm, irreparable harm, and significant damages, in an

amount to be proven at trial. League also seeks, in addition to monetary damages, permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests. League operates in a competitive market and will continue to suffer irreparable harm if injunctive relief is not granted. League has no other adequate remedy at law for the irreparable harm it will continue to suffer as a result of Plaintiff's misappropriation.

64.    League also seeks an award for exemplary damages and attorneys' fees.

**COUNT II**
**MISAPPROPRIATION OF TRADE SECRETS**
**MASSACHUSETTS TRADE SECRETS ACT**
**MASS. GEN. LAWS C. 93, § 42-42G**

65.    League incorporates each of the above paragraphs as if fully set forth herein.

66.    League owns and possesses certain confidential, proprietary and trade secret information as alleged above that derive independent economic value from not being known or readily ascertainable through proper means.

67.    League took reasonable measures to protect the secrecy and confidentiality of the League Trade Secrets including by imposing confidentiality and security policies, limiting access to the League Trade Secrets to authorized individuals with a business need to know, and imposing other security measures such as password protection and encryption software that monitors application and data usage.

68.    Accordingly, the above-described information constitutes "trade secrets" under the Massachusetts Trade Secret Act, M.G.L. c. 93 § 42(4).

69.    League's former and current employees are under a duty to maintain the confidentiality of the League Trade Secrets and are prohibited from disclosing, allowing access to, transmitting, or transferring any of this information to a third party.  Employees are further

prohibited from copying or reproducing League's confidential and proprietary information, including the League Trade Secrets, and/or using it for any purposes other than to perform job duties on behalf of League and in furtherance of its interests.

70.    Plaintiff accessed and downloaded a wide array of documents and files containing the League Trade Secrets, including, without limitation, the documents set forth in Paragraph 10.

71.    Plaintiff improperly and without authorization exfiltrated League's confidential and proprietary information, including the League Trade Secrets.

72.    Plaintiff has taken and retained the League Trade Secrets in an unauthorized fashion.

73.    Plaintiff engaged in this conduct while he was employed as an outside consultant for a competitor company, in express violation of his employment agreements with League.

74.    Plaintiff has used or intends to use the League Trade Secrets for his own benefit and/or for the benefit of his current employer, which is detrimental to League.

75.    Plaintiff's misappropriation of the League Trade Secrets was willful and malicious.

76.    As a direct and proximate result of Plaintiff's conduct, League has suffered and will continue to suffer severe competitive harm, irreparable harm, and significant damages, in an amount to be proven at trial. League also seeks, in addition to monetary damages, permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests. League operates in a competitive market and will continue to suffer irreparable harm if injunctive relief is not granted. League has no other adequate remedy at law for the irreparable harm it will continue to suffer as a result of Plaintiff's misappropriation.

77.    League also seeks an award for exemplary damages and attorneys' fees.

<u>COUNT III</u>
**BREACH OF CONTRACT**

78.    League incorporates each of the above paragraphs as if fully set forth herein.

79.    As a condition of his employment with League, Plaintiff accepted and agreed to the terms of his Offer Letter and the Proprietary Rights Agreement. <u>Exhibits A and B</u>.

80.    The Offer Letter and the Proprietary Rights Agreement constitute the entire agreement between League and Plaintiff with respect to his employment. <u>Exhibit A</u>.

81.    Under the terms of the Proprietary Rights Agreement, Plaintiff agreed to "keep in strictest confidence and trust" League's confidential and proprietary information, including the League Trade Secrets, and was prohibited from disclosing, allowing access to, transmitting, or transferring any of this information to a third party.  Plaintiff was further prohibited from copying or reproducing League's confidential and proprietary information, including the League Trade Secrets.  <u>Exhibit B</u>, ¶ 2.

82.    Plaintiff also agreed to not use League's confidential and proprietary information, including the League Trade Secrets, except as required to perform his job duties and responsibilities while employed at League. <u>Exhibit B</u>, ¶ 3(b).

83.    Upon the end of his employment with League, Plaintiff was required to immediately return all materials containing League's confidential and proprietary information, including the League Trade Secrets, in his possession. <u>Exhibit B</u>, ¶ 3(c).

84.    Plaintiff's obligations with respect to the confidentiality, non-use and non-disclosure of League's confidential and proprietary information, including the League Trade Secrets, survived even after the end of his employment with League. <u>Exhibit B</u>, ¶¶ 2, 3.

85.     Plaintiff breached the terms of the Offer Letter and the Proprietary Rights Agreement by: (i) accessing and downloading a wide array of documents and files containing the League Trade Secrets, including, without limitation, the documents set forth in Paragraph 10.

86.     As a result of Plaintiff's conduct, League has suffered and will suffer irreparable harm.

**COUNT IV**
**BREACH OF DUTY OF LOYALTY**

87.     League incorporates each of the above paragraphs as if fully set forth herein.

88.     Plaintiff owed League a duty of loyalty under the terms of his employment agreement with League. Exhibit A.

89.     Plaintiff breached his duty of loyalty by working for a competing company, Layer Health, as a consultant while being employed by League and feigning concerns about an uncertain job market to extract a favorable severance package from League. Indeed, at the time Plaintiff was making his demands that he be promoted or else receive enhanced severance benefits, he had already accepted an offer of full-time employment from Layer Health and was merely inciting a "without cause" termination so he could receive a severance package.

90.     From August 2025 until his termination in December 2025, Plaintiff effectively abandoned his duties and responsibilities to League and was generally unavailable to perform his work. Indeed, Plaintiff also took an unauthorized trip to London in August 2025 without requesting paid time off. He represented that he would be working remotely during that time but his League calendar shows a detailed itinerary of personal activities.

91.     As a result of Plaintiff's conduct, League has suffered and will suffer irreparable harm.

## COUNT V
## UNJUST ENRICHMENT

92.     League incorporates each of the above paragraphs as if fully set forth herein.

93.     Based on information and belief, from at least October 2025 through to the time he was terminated on December 17, 2025, Plaintiff was actively working as an outside consultant for Layer Health – a competitor of League in the healthcare artificial intelligence space – while still employed and receiving compensation from League.

94.     During the time that he was working for Layer Health, Plaintiff abandoned his duties for League in violation of his contractual obligations. Plaintiff also abandoned his duties and responsibilities to League beginning in August 2025. During this time, Plaintiff was unavailable and did not perform his job responsibilities, all the while receiving full pay and benefits from League.

95.     In addition, Plaintiff received commissions for the Optum deal in excess of what he was entitled to under the 2023 Plan.

96.     Accordingly, a benefit was conferred upon Plaintiff of which he was aware, and Plaintiff accepted such benefit under circumstances that make retention of such benefit inequitable.

97.     As a result of Plaintiff's conduct, he has been unjustly enriched to the detriment of League.

## JURY DEMAND

League hereby demands a trial by jury of all issues so triable.

## **PRAYER FOR RELIEF**

League respectfully seeks the following relief:

(a) A declaration that Plaintiff has no right to use or disclose League's confidential and proprietary information, including the League Trade Secrets;

(b) A declaration that Plaintiff breached the terms of his employment agreement with League;

(c) A declaration that Plaintiff breached his duty of loyalty owed to League;

(d) For a judgment in favor of League on all of its counterclaims;

(e) Permanent injunctive relief enjoining Plaintiff from: (i) possessing, disclosing or using League's confidential and proprietary information, including the League Trade Secrets and (ii) deleting, disposing, altering or destroying any evidence, in whatever form, relating to this action;

(f) An Order from the Court directing Plaintiff to: (i) catalog, quarantine, and return all League confidential and proprietary information, including the League Trade Secrets, and all documents and files that contain or reflect League's confidential and proprietary information, including the League Trade Secrets; (ii) identify each individual and entity to whom or to which Plaintiff disclosed League's confidential and proprietary information, including the League Trade Secrets; and (iii) return any proceeds received from his misappropriation of League's confidential and proprietary information, including the League Trade Secrets;

(g) Damages in an amount to be determined at trial including compensatory damages, exemplary damages, and punitive damages;

(h) Pre-judgment and post-judgment interest;

(i)  League's reasonable attorney fees;

(j)  All other relief at law or in equity that League is entitled to; and

(k)  Any other relief the Court deems just and proper.

Respectfully submitted,

LEAGUE CORP.

By Its Attorneys,

/s/ Diana A. Balluku
John S. Gearan (BBO No. 668372)
Diana A. Balluku (BBO No. 698128)
Colin W. B. Kennedy (BBO No. 711290)
GREENBERG TRAURIG LLP
One International Place
Boston, MA 02110
Telephone: (617) 310-6000
Facsimile: (617) 310-6001
gearanj@gtlaw.com
diana.balluku@gtlaw.com
colin.kennedy@gtlaw.com

DATED: January 27, 2026

## CERTIFICATE OF SERVICE

I, Diana A. Balluku, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be served on all those non-registered participants by mail on January 27, 2026.

/s/ Diana A. Balluku
Diana A. Balluku

# **<u>EXHIBIT A</u>**



515 North State Street, Suite 800
Chicago, IL

June 29, 2021

Personal & Confidential
Christopher Authier
Delivered Via Docusign to cjauthier@gmail.com

Dear Christopher:

Re:    **Employment Offer; United States**

At League, our mission to help people live happier, healthier lives is our purpose and **OUR PEOPLE ARE OUR ENGINE**.  We are excited to welcome you to our #dreamteam.  Below please find the details of your full-time employment offer with League Corp. ("League", "the Company" or "we"):

**Position:**           RVP Sales, Platform

**Location:**           Boston, MA

**Start Date:**         September 7, 2021

**Base Salary:**        $225,000 per annum ("Base Salary")

**Commission**:        Discretionary Commission of up to 100% of base salary.

**Current Benefits**:   League benefits as set out in an electronic booklet that will be forwarded to you under separate cover("Benefits").

**Stock Options**:      You may be eligible to receive a one time grant of 150,000 options from the Employee Stock Option Plan ("ESOP").

**Vacation**:          You are entitled to take as much paid vacation per year as approved in advance by your manager.

The following covenants, terms and conditions will set out our mutual agreement regarding your employment at League. To accept this offer and the terms outlined herein, sign a copy of this letter and return it by July 6, 2021. Please keep a copy for your records as well.

**Job Duties**:  As RVP Sales, Platform, you will report to Andrew Dubowec, and you will be responsible for carrying out those duties and exercising those powers as are reasonably assigned to you from time to time.   As we grow as a company we may need to make changes to your job duties and as such, the terms in this employment letter will cover any position or responsibility you have now, or hold later with League, unless we replace this letter with a new employment letter and/or agreement.

**Salary and Benefits:**  Your Base Salary less applicable deductions will be paid semi-monthly by direct deposit. From time to time, League may make changes to the Benefits and the percentage of premiums paid and any such change will not cause a breach of this agreement. If any of the Benefits are administered by a third party (e.g. BSBC, Guardian Dental, Optum Bank...), entitlement to and eligibility for benefits will be determined in accordance with the plan document and governed by the third party.

**Discretionary commission:** You may be eligible to receive a discretionary bonus payment (each such payment, a "Discretionary Bonus") of up to 100% of Base Salary. For the first quarter and second quarter of your employment, your Discretionary Bonus payment will be guaranteed at $56,250.00 USD. Thereafter, such Discretionary Bonus may be paid and determined in accordance with policies that may be introduced and changed from time to time.

In order to qualify for commission, you must be "actively employed" and an employee of League in good standing on the date that the discretionary commission is awarded.  You cease to be "actively employed" as of the date written notice of termination or written notice of resignation is actually delivered without regard to any period of notice or pay in lieu of notice.

**Employee Share Option Plan**: The League management team will recommend to the board of directors of League, or the compensation committee appointed thereby, that you be granted 150,000 options (the "Granted Options"). One-quarter (1/4) of the Granted Options shall vest on the one (1) year anniversary of the vesting start date, if your employment has not ceased. The remaining unvested Granted Options shall vest monthly in equal amounts over the following thirty-six (36) months until vested in full or until your employment ceases, whichever occurs first as further described and governed by the *League Employee Stock Option Plan*.

There is no guarantee that you will receive approval by the Board of Directors to participate in the ESOP or of the specific number of options which will be granted.

**Vacation:** Your vacation time will be subject to League's business needs, the requirements of your job, and must be approved by your manager before taking. We ask that you provide as much notice of your preferred vacation time as possible. Vacation entitlement will not carry over from one year to the next, unless such is required by applicable employment legislation.

**Expenses:** All business-related expenses will be covered by the company provided they comply with the travel and expense policy and all internal control procedures and are submitted to and approved by the Company.  Further guidance may be found in *League's Expenses and Work Travel Policy*, which may change from time to time.

**Conditions:** This offer of employment with League is conditional upon:

    a) Completion of a satisfactory background check which may include, but is not limited to, a criminal record check, reference checks, an educational verification and a credit

Page 3

check.  You consent and understand that background checks may be completed throughout your employment from time to time. By signing this agreement, you are providing the Company with your written consent to undertake these background checks from time to time.  Furthermore, you understand and agree that this offer of employment may be rescinded or your employment may be terminated immediately in the event that you do not complete any documents needed to conduct this background check, or where the results of this background check are not satisfactory to the Company.  You also understand and agree that an unsatisfactory background check will constitute cause for termination under the terms of this agreement.

b)  This offer of employment is conditional upon you being lawfully permitted to work in the United States of America, being lawfully permitted to travel to Canada for business purposes as required and to be licensed by any third party regulator as required in order to perform the duties of your job. Continued employment with the Company is conditional upon maintaining your legal status and eligibility for any licenses required to perform the duties of your job. Failure to do so will constitute cause for termination under the terms of this agreement. Additionally, an unlicensed employee is prohibited from transacting insurance business as well as from receiving or sharing discretionary commissions based on the sale of insurance.

c)  Successful completion of the introductory period (described below).

**Introductory Period:**  The first 3 months of your employment is defined as an introduction to League (the "Introductory Period").  During this time, your manager will discuss with you our expectations relative to your performance, help you orient yourself to our policies and practices, and will provide you guidance to assist you in learning your responsibilities.

**Good Faith and Best Efforts:**  Given the nature of your position and the flexibility of our work environment, we ask in return that you be diligent, give your best efforts daily, and act in good faith to League in performing your work for League.

**Policies:** During your orientation and Introductory Period, you will be provided with access to League's policies including but not limited to *the League Code of Conduct*.  It is important that you understand and abide by these policies.  If you ever have a question about a League policy, ask your manager or a representative from the People and Culture Team.

**Ending your Employment League:**  There are several ways that your employment with League might come to an end:

a)  By you, with notice to League, (i.e. resignation);
b)  By League if you act in a way that amounts to just cause for termination;
c)  By League during the Introductory Period; OR
d)  By League after the Introductory Period, by providing you with Notice.

a)  <u>By You with Notice</u>

If you decide to leave League, you must give your manager a minimum of two (2) weeks' advanced notice in writing.  Should the Company decide to waive your notice period, the Company will pay your Base Salary and make all Company paid benefit contributions and deduct any employee paid benefit contributions (if any) to the benefit plans throughout this period.  You understand and agree that if League waives the notice period that it is not

Page 4

considered a termination of your employment by League.

b) <u>For Just Cause</u>

League has the right, at any time and without notice, to terminate your employment under this Agreement for cause without any obligation to provide notice or pay in lieu thereof or severance pay.

c) <u>During or at the end of the Introductory Period</u>

If, at any time during or at the end of the Introductory Period, we determine that you are not suitable for regular employment with us, League may end your employment.

d) <u>By League with Notice</u>

League may terminate your employment at any time without cause by providing you with the greater of:

(i) Twenty four (24) weeks pay (including, without limitation, wages, notice or pay in lieu of notice of termination, vacation pay, benefits continuance and, if applicable, severance pay), **OR**
(ii) notice based on your years of service as follows:

- For a termination occurring within the first twelve (12) months of employment – 2 weeks ' notice;
- For a termination occurring after the first year and prior to four (4) full years of service – 4 weeks 'notice;
- For a termination occurring after four (4) completed years of service up to 12 years of service – one (1) week of notice for each completed 12-month period of service;
- For a termination occurring after 12 full years of service – 12 weeks 'notice ("Notice") League may provide the Notice in any single or combination of the following ways:
  - Advance notice prior to termination;
  - Continuation of your Base Salary, less applicable deductions, plus benefits continuance as permitted by the benefit plan(s) ("Salary Continuation"); OR
  - Lump sum payment, less applicable deductions, calculated using your Base Salary plus continuation of benefits or other terms.

League shall have no obligation to make any payment described above in section (d) that are in excess of any minimum entitlements owed upon termination unless or until you executes and deliver to the Company a release in a form acceptable to the Company, releasing the Company from any and all claims arising out of or related to your employment with the Company.

Upon compliance with this provision by League, you will not be entitled to any further compensation, notice or pay in lieu of notice, benefits continuance or damages of any kind, whether statutory, contractual at common law or otherwise, and in consideration of League complying with this provision, you release League from all such claims.

**Return of Property:**  When your employment ends for any reason, you must return to League all files, documents, effects, equipment, money, securities or other property belonging to

Page 5

League or for which League is liable to others, that are in your possession, charge, control or custody.

**Requests for Assistance:** If you have a disability that impairs or restricts your ability to access the workplace, access information in the workplace, or perform your duties, League may be able to provide assistance in accordance with its practices, policies, and procedures for accommodation.

**Miscellaneous Fine Print:** Upon your acceptance, this offer will be considered your "employment agreement" which, along with the Proprietary Rights Agreement, constitute the entire agreement between you and League with respect to your employment with League and replaces any prior understandings and agreements between you and League with respect to your employment.

If any part of this agreement or its appendix is found to be invalid or unenforceable, it will not invalidate the remainder of the agreement which shall remain in full force and effect. Any changes to this agreement must be in writing and signed by you and League to be in effect and enforceable.

This Agreement shall be exclusively governed by and interpreted in accordance with the laws of the State of MA without regard to conflicts of law principles. Any action or proceeding by either of the parties to enforce this Agreement shall be brought only in a state or federal court located in the State MA. The parties hereby irrevocably submit to the exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue.

This "fine print", the paragraph regarding Return of Property, and the Proprietary Rights Agreement will continue in effect even after your employment ends and this agreement terminates for any reason.

**Electronic Signature:** We may execute this in counterparts, each of which shall be deemed to be an original and all of which together shall constitute one agreement. If either of our signatures to this agreement or its appendix is recorded or made and delivered solely in electronic form, it shall have the same effect and create the same binding legal obligations as a signature made and delivered in person.

**Welcome!**

We are very pleased to have you join League and we look forward to having you assist League in its continued efforts to transform the corporate benefits landscape. On behalf of the League Board of Directors and staff, we extend to you our welcome to League.

Yours very truly,

Page 6

**LEAGUE CORP. per:**


_____
**Michael Serbinis, CEO**


June 29, 2021

_____
**Date**

Page 7

**ACCEPTANCE**

I have read, understood and agree with everything set out in this offer letter.

I have been provided a reasonable period to consider this letter, to ask questions, and/or to request clarification.

I voluntarily accept each of the terms and conditions outlined in the offer letter and indicate my acceptance through my initials on each page and my signature below.

_____ SIGNATURE

**Christopher Authier**

June 29, 2021

_____

**Date**

**PROPRIETARY RIGHTS AGREEMENT**

Page 8

I, Christopher Authier, recognize that League Inc. (the "Corporation") is engaged in a continuous program of software and other research, design, development, marketing, promoting, and selling a digital health, wellness and lifestyle platform to allow employers and employees interact with their benefits and use technology to deliver a differentiated and affordable health and wellness benefit plans to businesses across North America.

I also recognize the importance of protecting the Corporation's trade secrets, confidential information and other proprietary information and related rights acquired through the Corporation's expenditure of time, effort, and money.

Therefore, because I wish to work with the Corporation in a capacity in which I will receive and/or contribute to the Corporation's Confidential Information, and for other good and valuable consideration, I agree to be bound by the following terms and conditions:

1) **Definitions**
   For purposes of this Proprietary Rights Agreement:

   a) **"Confidential Information"** includes any of the following:
      i) any and all versions of any software and related documentation owned or marketed by the Corporation (including services related to such software), as well as the technology, software and documentation owned by the Corporation's suppliers and used internally by the Corporation, including all related algorithms, concepts, data, health-related information, graphics, designs, images, audio and visual content, flowcharts, ideas, programming techniques, specifications and source code listings;
      ii) all Developments (as defined below);
      iii) information regarding the Corporation's business operations, methods and practices, including marketing and advertising strategies, product pricing, margins, wages, salaries and hourly rates for staff, budgets, forecasts, analyses, financial results, bids, services and other information regarding the business and financial affairs of the Corporation;
      iv) the names, addresses and other information regarding the Corporation's clients and the names of the suppliers to the Corporation, including the nature of the Corporation's relationships with these clients and suppliers;
      v) technical and business information of or regarding the clients of the Corporation obtained in order for the Corporation to provide such clients with products and services;
      vi) all worldwide intellectual and industrial property of the Corporation, whether registered or unregistered, including but not limited to software, design, and schematics, and all technical expertise and know-how with respect to the products, services and business of the Corporation;
      vii) any other trade secret or confidential or proprietary information of the Corporation or third parties with whom it conducts business or that is otherwise in the possession and control of the Corporation; AND
      viii) information protected by Canadian or US privacy laws, including personal, employment, health, and financial records of any person collected and maintained by the Corporation in the course of the Corporation's business, but Confidential Information does not include information which is and/or becomes generally available to the public other than due to a breach of this agreement or which I can establish, through written records, was in my possession prior to its disclosure to me as a result of my work for the Corporation.

Page 9

      **b)** **"Developments"** include all:
- i) software, design, websites, marketing information or methodologies, services, integrated circuits, schematics, documentation, data, designs, reports, flowcharts, trade-marks, specifications and source code listings, and any related works, including any enhancements, modifications, or additions to the products owned, marketed or used by the Corporation; AND
- ii) inventions, devices, discoveries, concepts, ideas, algorithms, formulae, know-how, processes, techniques, systems and improvements, whether patentable or not, developed, created, generated or reduced to practice by me, alone or jointly with others, during my work with the Corporation or which result from tasks assigned to me by the Corporation or which result from the use of the premises or property (including equipment, supplies or Confidential Information) owned, leased or licensed by the Corporation.

**2)** **Non-Disclosure of Confidential Information**

At all times during and subsequent to the termination of my work with the Corporation, I shall keep in strictest confidence and trust the Confidential Information, I shall take all necessary precautions against unauthorized disclosure of the Confidential Information, and I shall not directly or indirectly disclose, allow access to, transmit or transfer Confidential Information to a third party, nor shall I copy or reproduce the Confidential Information except as may be reasonably required for me to perform my duties for the Corporation.

**3)** **Restricted Use of Confidential Information**

    a) At all times during and subsequent to the termination of my work with the Corporation, I shall not use the Confidential Information in any manner except as reasonably required for me to perform my work for the Corporation.
    b) Without limiting my obligations under subsection 3(a), I agree that at all times during and subsequent to the termination of my work with the Corporation I shall not use or take advantage of the Confidential Information for creating, maintaining or marketing, or aiding in the creation, maintenance or marketing, of any software or service which is competitive with any software owned or service marketed by the Corporation.
    c) Upon the request of the Corporation, and in any event upon the termination of my work with the Corporation, I shall immediately return to the Corporation all materials, including all copies in whatever form, containing the Confidential Information which are in my possession or under my control.

**4)** **Ownership of Confidential Information**

    a) I acknowledge and agree that I shall not acquire any right, title or interest in or to the Confidential Information.

    b) I agree to make full disclosure to the Corporation of each Development promptly after its creation. I hereby assign and transfer to the Corporation, and agree that the Corporation shall be the exclusive owner of, all of my right, title and interest to each Development throughout the world, including all trade secrets, patent rights, copyrights and all other intellectual property rights therein. I further agree to cooperate fully at all times during and subsequent to my work with respect to signing further documents and doing such acts and other things reasonably requested by the Corporation to confirm such transfer of ownership of rights, including intellectual property rights, effective at or

Page 10

after the time the Development is created and to obtain patents or copyrights or the like covering the Developments.  I agree that the obligations in this clause (b) shall continue beyond the termination of my work with the Corporation with respect to Developments created during my work with the Corporation.

c)  I agree that the Corporation, its assignees and their licensees are not required to designate me as the author of any Developments.  I hereby waive in whole all moral rights which I may have in the Developments, including the right to the integrity of the Developments, the right to be associated with the Developments, the right to restrain or claim damages for any distortion, mutilation or other modification of the Developments, and the right to restrain use or reproduction of the Developments in any context and in connection with any product, service, cause or institution.

5)  **No Conflicting Obligations**

a)  I acknowledge and represent to the Corporation that my work for the Corporation shall not breach any agreement or other obligation to keep confidential proprietary information of any prior employer of mine or any other third party.  I further acknowledge and represent that I am not bound by any agreement or obligation to any third party which conflicts with any of my obligations under this Proprietary Rights Agreement.

b)  I represent and agree that I will not bring to the Corporation, and shall not use in the performance of my work with the Corporation, any trade secrets, confidential information and other proprietary information of any prior employer of mine or any other third party.  I represent and agree that in my work creating Developments I will not knowingly infringe the intellectual property rights, including copyright, of any third party.

6)  **Non-Solicitation**

a)  I agree that while I am an employee of the Corporation, and for twelve (12) months after I cease to be an employee, I will not directly or indirectly on my own behalf or on behalf of any other person or entity:

i)   contact or solicit any customers or Prospective Customers of the Corporation for the purpose of selling or supplying products or services similar to those sold or supplied by the Corporation; AND

ii)  solicit, induce, or attempt to induce or solicit any employee, consultant, supplier, broker, or third-party health provider of the Corporation to terminate their employment, engagement, or relationship with the Corporation.

"Prospective Customers" means those employers who, during my employment, I know are being canvassed or solicited by or on behalf of the Corporation.

b)  After I cease being an employee, clause (a) applies to customers, Prospective Customers, employees, consultants, suppliers, brokers, or third party health providers who were customers, Prospective Customers, employees, consultants, suppliers, brokers, or third party health providers at any time during the twelve (12) months preceding my last day of employment and (i) with whom I had personal contact; or (ii) about which I gained Confidential Information while employed with the Corporation.

Page 11

## 7) <u>Other Tax Matters</u>

a) The Company shall withhold all applicable federal, state and local taxes, social security and workers' compensation contributions and other amounts as may be required by law with respect to compensation payable to you by this Agreement.

b) Notwithstanding anything herein to the contrary, this Agreement is intended to be interpreted and applied so that the payment of the benefits set forth herein either shall (i) be exempt from the requirements of Section 409A of the Code ("Section 409A") to the maximum extent permissible, and to the extent not so exempt, (ii) shall comply with the requirements of such provision.  Notwithstanding any provision of this Agreement to the contrary, if you are a "specified employee" within the meaning of Section 409A, any payments or arrangements due upon a termination of your employment under any arrangement that constitutes a "deferral of compensation" within the meaning of Section 409A and which do not otherwise qualify under the exemptions under Treas. Regs. Section 1.409A-1 (including without limitation, the short-term deferral exemption or the permitted payments under Treas. Regs. Section 1.409A-1(b)(9)(iii)(A)), shall be delayed and paid or provided on the earlier of (i) the date which is six months after your "separation from service" (as such term is defined in Section 409A and the regulations and other published guidance thereunder) for any reason other than death, and (ii) the date of your death.

c) After any Termination Date, you shall have no duties or responsibilities that are inconsistent with having a "separation from service" within the meaning of Section 409A as of the Termination Date and, notwithstanding anything in the Agreement to the contrary, distributions upon termination of employment may only be made upon a "separation from service" as determined under Section 409A and such date shall be the Termination Date for purposes of this Agreement.  Each payment under this Agreement or otherwise shall be treated as a separate payment for purposes of Section 409A.  In no event may you, directly or indirectly, designate the calendar year of any payment to be made under this Agreement which constitutes a "deferral of compensation" within the meaning of Section 409A.

d) Any amounts otherwise payable to yourself following a termination of employment that are not paid by reason of this Section 8 shall be paid as soon as practicable following, and in any event within thirty (30) days following the date that is six months after your separation from service (or, if earlier, the date of Executive's death) together with interest on the delayed payment at the Company's cost of borrowing.  All reimbursements and in-kind benefits provided under this Agreement shall be made or provided in accordance with the requirements of Section 409A.

e) To the extent that any reimbursements pursuant to Section 4 or otherwise are taxable to Executive, any reimbursement payment due to your pursuant to such Section shall be paid to you on or before the last day of your taxable year following the taxable year in which the related expense was incurred.  The reimbursements pursuant to Section 4 or otherwise are not subject to liquidation or exchange for another benefit and the amount of such reimbursements you receive in one taxable year shall not affect the amount of such reimbursements that you receive in any other taxable year.

Page 12

8) **General**

a) This Proprietary Rights Agreement shall be governed by the laws in force in the Province of Ontario.  If any provision of this Proprietary Rights Agreement is wholly or partially unenforceable for any reason, such unenforceable provision or part thereof shall be deemed to be omitted from this Proprietary Rights Agreement without in any way invalidating or impairing the other provisions of this Proprietary Rights Agreement.  In this Proprietary Rights Agreement any reference to a termination of work shall include termination for any reason whatsoever and with or without cause.

b) The rights and obligations under this Proprietary Rights Agreement shall survive the termination of my work for the Corporation and shall inure to the benefit of and shall be binding upon (i) my heirs and personal representatives and (ii) the successors and assigns of the Corporation.

I HAVE READ THIS AGREEMENT, UNDERSTAND IT, HAVE HAD THE OPPORTUNITY TO OBTAIN INDEPENDENT LEGAL ADVICE IN RESPECT OF IT, AND I AGREE TO ITS TERMS.  I acknowledge having received a fully executed copy of this Proprietary Rights Agreement.

_Christopher Authier_ SIGNATURE   _Christopher Authier_
DocuSigned by:                     DocuSigned by:
02D643749F504E3...                 02D643749F504E3...
_____
**Christopher Authier**

June 29, 2021
_____
**Date**


_M Serbinis_
_____
**Michael Serbinis, CEO**

June 29, 2021
_____
**Date**

**DocuSign®**

## Certificate Of Completion

Envelope Id: 2E80C8866E3D46A5B4E74A6F46E3DE6E                                    Status: Completed
Subject: Offer from League!
Source Envelope:
Document Pages: 12                        Signatures: 4                          Envelope Originator:
Certificate Pages: 4                      Initials: 0                            Alice Preager
AutoNav: Enabled                                                                 661 University Ave Suite 480
EnvelopeId Stamping: Enabled                                                     TORONTO, ON  M5G 1M1
Time Zone: (UTC-05:00) Eastern Time (US & Canada)                               acudmore@league.com
                                                                                IP Address: 44.225.206.62

## Record Tracking

Status: Original                          Holder: Alice Preager                  Location: DocuSign
        6/30/2021 12:40:56 PM                     acudmore@league.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Christopher Authier<br>cjauthier@gmail.com<br>Security Level:<br>.Email<br>ID: 7e508c9f-409e-4260-a2be-df601b1caeb5<br>6/30/2021 8:22:59 PM | *Christopher Authier*<br>DocuSigned by:<br>—02D6437 49F504E3...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 24.60.80.33 | Sent: 6/30/2021 12:40:57 PM<br>Viewed: 6/30/2021 8:23:08 PM<br>Signed: 6/30/2021 9:21:38 PM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 6/30/2021 8:23:08 PM<br>ID: eb0bd25c-c69b-4626-858e-44688cbd474b | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 6/30/2021 12:40:57 PM |
| Certified Delivered | Security Checked | 6/30/2021 8:23:08 PM |
| Signing Complete | Security Checked | 6/30/2021 9:21:38 PM |
| Completed | Security Checked | 6/30/2021 9:21:38 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, League, Inc (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact League, Inc:**
You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
 To contact us by email send messages to: srose@league.com


**To advise League, Inc of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at srose@league.com and in the body of such request you must state: your previous e-mail address, your new e-mail address.  We do not require any other information from you to change your email address..
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.

**To request paper copies from League, Inc**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to srose@league.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with League, Inc**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

> i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
> ii. send us an e-mail to srose@league.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..


**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br><br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**
To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.
By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify League, Inc as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  League, Inc during the course of my relationship with you.

# **<u>EXHIBIT B</u>**

Page 8

I, Christopher Authier, recognize that League Inc. (the "Corporation") is engaged in a continuous program of software and other research, design, development, marketing, promoting, and selling a digital health, wellness and lifestyle platform to allow employers and employees interact with their benefits and use technology to deliver a differentiated and affordable health and wellness benefit plans to businesses across North America.

I also recognize the importance of protecting the Corporation's trade secrets, confidential information and other proprietary information and related rights acquired through the Corporation's expenditure of time, effort, and money.

Therefore, because I wish to work with the Corporation in a capacity in which I will receive and/or contribute to the Corporation's Confidential Information, and for other good and valuable consideration, I agree to be bound by the following terms and conditions:

1) **Definitions**
   For purposes of this Proprietary Rights Agreement:

   a) **"Confidential Information"** includes any of the following:
      i) any and all versions of any software and related documentation owned or marketed by the Corporation (including services related to such software), as well as the technology, software and documentation owned by the Corporation's suppliers and used internally by the Corporation, including all related algorithms, concepts, data, health-related information, graphics, designs, images, audio and visual content, flowcharts, ideas, programming techniques, specifications and source code listings;
      ii) all Developments (as defined below);
      iii) information regarding the Corporation's business operations, methods and practices, including marketing and advertising strategies, product pricing, margins, wages, salaries and hourly rates for staff, budgets, forecasts, analyses, financial results, bids, services and other information regarding the business and financial affairs of the Corporation;
      iv) the names, addresses and other information regarding the Corporation's clients and the names of the suppliers to the Corporation, including the nature of the Corporation's relationships with these clients and suppliers;
      v) technical and business information of or regarding the clients of the Corporation obtained in order for the Corporation to provide such clients with products and services;
      vi) all worldwide intellectual and industrial property of the Corporation, whether registered or unregistered, including but not limited to software, design, and schematics, and all technical expertise and know-how with respect to the products, services and business of the Corporation;
      vii) any other trade secret or confidential or proprietary information of the Corporation or third parties with whom it conducts business or that is otherwise in the possession and control of the Corporation; AND
      viii) information protected by Canadian or US privacy laws, including personal, employment, health, and financial records of any person collected and maintained by the Corporation in the course of the Corporation's business, but Confidential Information does not include information which is and/or becomes generally available to the public other than due to a breach of this agreement or which I can establish, through written records, was in my possession prior to its disclosure to me as a result of my work for the Corporation.

Page 9

    **b)** **"Developments"** include all:
        i)   software, design, websites, marketing information or methodologies, services, integrated circuits, schematics, documentation, data, designs, reports, flowcharts, trade-marks, specifications and source code listings, and any related works, including any enhancements, modifications, or additions to the products owned, marketed or used by the Corporation; AND
        ii)  inventions, devices, discoveries, concepts, ideas, algorithms, formulae, know-how, processes, techniques, systems and improvements, whether patentable or not, developed, created, generated or reduced to practice by me, alone or jointly with others, during my work with the Corporation or which result from tasks assigned to me by the Corporation or which result from the use of the premises or property (including equipment, supplies or Confidential Information) owned, leased or licensed by the Corporation.

**2)** **Non-Disclosure of Confidential Information**

At all times during and subsequent to the termination of my work with the Corporation, I shall keep in strictest confidence and trust the Confidential Information, I shall take all necessary precautions against unauthorized disclosure of the Confidential Information, and I shall not directly or indirectly disclose, allow access to, transmit or transfer Confidential Information to a third party, nor shall I copy or reproduce the Confidential Information except as may be reasonably required for me to perform my duties for the Corporation.

**3)** **Restricted Use of Confidential Information**

    a)  At all times during and subsequent to the termination of my work with the Corporation, I shall not use the Confidential Information in any manner except as reasonably required for me to perform my work for the Corporation.
    b)  Without limiting my obligations under subsection 3(a), I agree that at all times during and subsequent to the termination of my work with the Corporation I shall not use or take advantage of the Confidential Information for creating, maintaining or marketing, or aiding in the creation, maintenance or marketing, of any software or service which is competitive with any software owned or service marketed by the Corporation.
    c)  Upon the request of the Corporation, and in any event upon the termination of my work with the Corporation, I shall immediately return to the Corporation all materials, including all copies in whatever form, containing the Confidential Information which are in my possession or under my control.

**4)** **Ownership of Confidential Information**

    a)  I acknowledge and agree that I shall not acquire any right, title or interest in or to the Confidential Information.

    b)  I agree to make full disclosure to the Corporation of each Development promptly after its creation.  I hereby assign and transfer to the Corporation, and agree that the Corporation shall be the exclusive owner of, all of my right, title and interest to each Development throughout the world, including all trade secrets, patent rights, copyrights and all other intellectual property rights therein.  I further agree to cooperate fully at all times during and subsequent to my work with respect to signing further documents and doing such acts and other things reasonably requested by the Corporation to confirm such transfer of ownership of rights, including intellectual property rights, effective at or

Page 10

after the time the Development is created and to obtain patents or copyrights or the like covering the Developments.  I agree that the obligations in this clause (b) shall continue beyond the termination of my work with the Corporation with respect to Developments created during my work with the Corporation.

c)  I agree that the Corporation, its assignees and their licensees are not required to designate me as the author of any Developments.  I hereby waive in whole all moral rights which I may have in the Developments, including the right to the integrity of the Developments, the right to be associated with the Developments, the right to restrain or claim damages for any distortion, mutilation or other modification of the Developments, and the right to restrain use or reproduction of the Developments in any context and in connection with any product, service, cause or institution.

5)  **No Conflicting Obligations**

a)  I acknowledge and represent to the Corporation that my work for the Corporation shall not breach any agreement or other obligation to keep confidential proprietary information of any prior employer of mine or any other third party.  I further acknowledge and represent that I am not bound by any agreement or obligation to any third party which conflicts with any of my obligations under this Proprietary Rights Agreement.

b)  I represent and agree that I will not bring to the Corporation, and shall not use in the performance of my work with the Corporation, any trade secrets, confidential information and other proprietary information of any prior employer of mine or any other third party.  I represent and agree that in my work creating Developments I will not knowingly infringe the intellectual property rights, including copyright, of any third party.

6)  **Non-Solicitation**

a)  I agree that while I am an employee of the Corporation, and for twelve (12) months after I cease to be an employee, I will not directly or indirectly on my own behalf or on behalf of any other person or entity:

i)  contact or solicit any customers or Prospective Customers of the Corporation for the purpose of selling or supplying products or services similar to those sold or supplied by the Corporation; AND

ii)  solicit, induce, or attempt to induce or solicit any employee, consultant, supplier, broker, or third-party health provider of the Corporation to terminate their employment, engagement, or relationship with the Corporation.

"Prospective Customers" means those employers who, during my employment, I know are being canvassed or solicited by or on behalf of the Corporation.

b)  After I cease being an employee, clause (a) applies to customers, Prospective Customers, employees, consultants, suppliers, brokers, or third party health providers who were customers, Prospective Customers, employees, consultants, suppliers, brokers, or third party health providers at any time during the twelve (12) months preceding my last day of employment and (i) with whom I had personal contact; or (ii) about which I gained Confidential Information while employed with the Corporation.

Page 11

7) <u>**Other Tax Matters**</u>

a) The Company shall withhold all applicable federal, state and local taxes, social security and workers' compensation contributions and other amounts as may be required by law with respect to compensation payable to you by this Agreement.

b) Notwithstanding anything herein to the contrary, this Agreement is intended to be interpreted and applied so that the payment of the benefits set forth herein either shall (i) be exempt from the requirements of Section 409A of the Code ("Section 409A") to the maximum extent permissible, and to the extent not so exempt, (ii) shall comply with the requirements of such provision. Notwithstanding any provision of this Agreement to the contrary, if you are a "specified employee" within the meaning of Section 409A, any payments or arrangements due upon a termination of your employment under any arrangement that constitutes a "deferral of compensation" within the meaning of Section 409A and which do not otherwise qualify under the exemptions under Treas. Regs. Section 1.409A-1 (including without limitation, the short-term deferral exemption or the permitted payments under Treas. Regs. Section 1.409A-1(b)(9)(iii)(A)), shall be delayed and paid or provided on the earlier of (i) the date which is six months after your "separation from service" (as such term is defined in Section 409A and the regulations and other published guidance thereunder) for any reason other than death, and (ii) the date of your death.

c) After any Termination Date, you shall have no duties or responsibilities that are inconsistent with having a "separation from service" within the meaning of Section 409A as of the Termination Date and, notwithstanding anything in the Agreement to the contrary, distributions upon termination of employment may only be made upon a "separation from service" as determined under Section 409A and such date shall be the Termination Date for purposes of this Agreement. Each payment under this Agreement or otherwise shall be treated as a separate payment for purposes of Section 409A. In no event may you, directly or indirectly, designate the calendar year of any payment to be made under this Agreement which constitutes a "deferral of compensation" within the meaning of Section 409A.

d) Any amounts otherwise payable to yourself following a termination of employment that are not paid by reason of this Section 8 shall be paid as soon as practicable following, and in any event within thirty (30) days following the date that is six months after your separation from service (or, if earlier, the date of Executive's death) together with interest on the delayed payment at the Company's cost of borrowing. All reimbursements and in-kind benefits provided under this Agreement shall be made or provided in accordance with the requirements of Section 409A.

e) To the extent that any reimbursements pursuant to Section 4 or otherwise are taxable to Executive, any reimbursement payment due to your pursuant to such Section shall be paid to you on or before the last day of your taxable year following the taxable year in which the related expense was incurred. The reimbursements pursuant to Section 4 or otherwise are not subject to liquidation or exchange for another benefit and the amount of such reimbursements you receive in one taxable year shall not affect the amount of such reimbursements that you receive in any other taxable year.

Page 12

## 8) <u>General</u>

a) This Proprietary Rights Agreement shall be governed by the laws in force in the Province of Ontario.  If any provision of this Proprietary Rights Agreement is wholly or partially unenforceable for any reason, such unenforceable provision or part thereof shall be deemed to be omitted from this Proprietary Rights Agreement without in any way invalidating or impairing the other provisions of this Proprietary Rights Agreement. In this Proprietary Rights Agreement any reference to a termination of work shall include termination for any reason whatsoever and with or without cause.

b) The rights and obligations under this Proprietary Rights Agreement shall survive the termination of my work for the Corporation and shall inure to the benefit of and shall be binding upon (i) my heirs and personal representatives and (ii) the successors and assigns of the Corporation.

I HAVE READ THIS AGREEMENT, UNDERSTAND IT, HAVE HAD THE OPPORTUNITY TO OBTAIN INDEPENDENT LEGAL ADVICE IN RESPECT OF IT, AND I AGREE TO ITS TERMS.  I acknowledge having received a fully executed copy of this Proprietary Rights Agreement.

*Christopher Authier* SIGNATURE        *Christopher Authier*
DocuSigned by:                          DocuSigned by:
02D643749F504E3...                      02D643749F504E3...

**Christopher Authier**

June 29, 2021
_____
**Date**

*M Serbinis*
_____
**Michael Serbinis, CEO**

June 29, 2021
_____
**Date**

**DocuSign**

## Certificate Of Completion

Envelope Id: 2E80C8866E3D46A5B4E74A6F46E3DE6E
Subject: Offer from League!
Source Envelope:
Document Pages: 12
Certificate Pages: 4
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-05:00) Eastern Time (US & Canada)

Signatures: 4
Initials: 0

Status: Completed

Envelope Originator:
Alice Preager
661 University Ave Suite 480
TORONTO, ON  M5G 1M1
acudmore@league.com
IP Address: 44.225.206.62

## Record Tracking

Status: Original
        6/30/2021 12:40:56 PM

Holder: Alice Preager
        acudmore@league.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Christopher Authier | *Christopher Authier* | Sent: 6/30/2021 12:40:57 PM |
| cjauthier@gmail.com | —DocuSigned by: | Viewed: 6/30/2021 8:23:08 PM |
| Security Level: | —02D6437A9F504E3... | Signed: 6/30/2021 9:21:38 PM |
| .Email | | |
| ID: 7e508c9f-409e-4260-a2be-df601b1caeb5 | Signature Adoption: Pre-selected Style | |
| 6/30/2021 8:22:59 PM | Using IP Address: 24.60.80.33 | |

Electronic Record and Signature Disclosure:
    Accepted: 6/30/2021 8:23:08 PM
    ID: eb0bd25c-c69b-4626-858e-44688cbd474b

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 6/30/2021 12:40:57 PM |
| Certified Delivered | Security Checked | 6/30/2021 8:23:08 PM |
| Signing Complete | Security Checked | 6/30/2021 9:21:38 PM |
| Completed | Security Checked | 6/30/2021 9:21:38 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, League, Inc (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact League, Inc:**
You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
 To contact us by email send messages to: srose@league.com


**To advise League, Inc of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at srose@league.com and in the body of such request you must state: your previous e-mail address, your new e-mail address.  We do not require any other information from you to change your email address..
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.

**To request paper copies from League, Inc**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to srose@league.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with League, Inc**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

> i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
> ii. send us an e-mail to srose@league.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..


**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies  •Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**
To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.
By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify League, Inc as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  League, Inc during the course of my relationship with you.

# **EXHIBIT C**

## The League Code of Conduct

### Overview

League's Code of Conduct reflects who we are, what's important to us, and how we conduct ourselves as employees and as an organization. It provides an overview of the laws, regulations and company policies that apply to us and the work we do.

More than that, the Code of Conduct builds upon our values and the ethical ways we must conduct ourselves while working at League. We expect every employee to abide by it, ensuring that all decisions made preserve the trust that others - our customers, members/users, leaders, fellow employees, providers, investors, and partners - have placed in us.

While our Code includes many policies within, it may not cover every situation you may face. Please remember to use your best judgment in everything you do. If you have any questions whatsoever about this Code of Conduct or any Policy within, please reach out to a member of the People Team, use the #people-team-feedback, #anonymous-leadership-feedback or #leadership-feedback channels in Slack, or submit a question to Ask-Exec-Anything.

### Our Collective Responsibility

The Code of Conduct applies to all members of the League team Full-time, Part-time, Employer of Record & Temporary employees (including contractors, consultants and students), suppliers and all others we do business with. Our Board of Directors acts to ensure League's prosperity by collectively directing League's affairs, whilst meeting the appropriate interests of our shareholders and stakeholders.

**Full-time, Part-time, Employer of Record & Temporary Employees (including Contractors, Fixed-term employees, consultants and students)** - You are required to review and sign this Code of Conduct on a yearly basis. We encourage you to read the attached resources and policies for further information and guidance. If you have any questions on how the Code may apply in certain situations, please ask your Manager, or a member of the People Team.

**Managers** - Like all employees, you are required to review and sign this Code of Conduct. Additionally, you are also responsible for reporting any misconduct to the People Team.

This misconduct may be something that you either witness personally, or that a member of your team witnesses and brings forward to you. You may be disciplined for not reporting misconduct that you knew about but did not report. See the "Reporting Violations" Section of this document for more details.

## Four Key Principles

League's Code of Conduct is based on four key principles:

1. **We are one team**
2. **We act with integrity**
3. **We trust and respect each other**
4. **We are ethical**

### We are one team

**Our core values create a culture that guides everything we do**

Our core values support our mission  and shape our culture. They inform what we do, and how we do it. League's values are:

- We are creating a healthier future
- We are building a dream team
- We are all owners
- We aspire to live our best lives
- We are in it to win it
- We are invested in inclusion

Managers at League are expected to model the right behavior, uphold this Code, hold employees to the highest ethical standards and promote a culture based on our values. For more on our culture at League, visit our online Employee Handbook.

**We help each other be better**

We have big ambitions and we work hard. We know that building a great company is challenging, so we rely on teamwork, open communication, and help from everyone - each other, our customers, our partners and our investors - to make League a success.

We also believe in fostering an environment in which every Leaguer can be their best self. We do this through all aspects of the employee experience from hiring and  onboarding, to goal-setting and performance, feedback and employee engagement, learning and development, pay and equity, health and wellbeing, and more.

### We act with integrity

**We look out for our collective best interests.**

As a Leaguer, we expect you to do what's best for League, our customers and members/users, providers and partners. There may be times that you face conflicting loyalties between personal or professional benefits for you, your friends or family, and League. This is where a conflict of interest may arise, and you must avoid these situations that create either a real or perceived conflict of interest.  League prohibits bribery and corruption of any kind. Please see our Conflict of Interest Policy for more information.

We have respect for each other and for League as a company. As such, we have a Traditional Media & Social Media Policy that provides guidance for interacting with the news media, and using social media as a League employee.

We also respect the communities and environment in which we work. Our Environmental Social Governance (ESG) Policy refers to our responsibility toward our environment and our commitment to giving back to the world just as it gives to us.

**We are honest, transparent and act within our authority**

We believe in honesty and transparency in everything we do. If we say something, privately or publicly, it's because we believe it to be true. We strive to be clear and transparent in all our communications. We don't intentionally omit important or relevant factual information in order to deceive others. We also encourage and respect independent, innovative thinking. This means we don't steal assets, content or information.

Our Legal Policy outlines how we address legal matters, while our Signing & Authorization Policy sets out how we handle contracts. Both policies outline how all Leaguers should act in order to ensure League's best interest.

**We protect assets and private information**

Using technology properly and keeping our information safe (including keeping your passwords confidential) is crucial to our success as a company. While League has an engineering and security team dedicated to keeping our systems secure, we also rely on each Leaguer to do their part and be vigilant at all times. Please read our Information Security Policy.

All League equipment, such as computers, should be used for League business purposes. For more information, read our Information Technology & Electronic Use Policy.

As a Leaguer, you have a duty to keep Personal Information private and commit to maintaining confidentiality of Personal Information during and after your employment or

work relationship with League. You are also obligated to comply with the terms of the Proprietary Rights Agreement that you signed in conjunction with your employment.

**We keep our promises and follow the laws.**

As a company we respect and obey the law always, and as a team member, you are obligated to do so as well. This goes for all laws of the cities, provinces, states and countries where we operate. The Compliance Policy helps to ensure the appropriate policies and procedures are in place to comply with applicable laws and regulations. Our Employee Privacy Notice explains what data we collect and how it is stored, used and shared, and our Sanctions Screening Notice further outlines how we comply with international sanctions and US federal exclusion requirements. Our Privacy and Data Protection Policy establishes the requirements for protection of Personal Information collected in the course of business at League. We also follow our Security and Privacy Awareness Training Policy to ensure all Leaguers follow the requirements for security, privacy and compliance awareness.

If we commit to do something, we do our best to do it. If we cannot keep our promises for some reason then we strive to make it right in any way possible.

## We trust and respect each other

**We believe in diversity, equity, inclusion and belonging.**

The diversity of League's employees is a tremendous asset. We come from all around the world and represent many diverse cultures, experiences and backgrounds. We strive to create and maintain an inclusive and anti-racist work environment in which all of us are treated with dignity, decency and respect. This is reflected in our Hiring Policy. As we scale our business, League is hiring talent internationally, some of whom may become eligible to relocate, aligned with our business needs. More information is available in our Relocation & Immigration Support Policy.

**We do not tolerate violence or harassment of any kind.**

We do not tolerate any sort of violence, harassment, sexual harassment or intimidation at League. This includes acts of physical and sexual harassment or violence, as well as comments, jokes and questions that are considered harassment or inappropriate in any way. More information is available in our Workplace Anti-Violence & Anti-Harassment Policy.

**We provide healthy and safe workplaces.**

We believe in ensuring all Leaguers are healthy and safe. As such, League has the responsibility to provide a safe and healthy work environment, and each of us has

responsibility for maintaining it by following the safety, health, and substance abuse rules and practices. More information is available in the Occupational Health & Safety Policy, Substance Abuse Policy and Pandemic Response Policy.

**We support and invest in our team members.**

We are invested in your health, happiness and future. To demonstrate that we support and appreciate each and every Leaguer, our total rewards strategy is outlined in our Compensation Policy and Benefits & Perks Policy. Together, they provide information on the types of compensation League offers, along with details of our health insurance and benefits plans, spending accounts, employee stock option plans, and more. We also believe in investing in our team members, including their development and career aspirations, for the long-term. You can read more in our Internal Mobility Policy.

We also believe in taking time to rest, recharge, and care for our selves and loved ones. You can check out the Parental Leave Policy, and the Vacation & Leave Policy for more information on what we offer to support you and your family.

**We trust each other.**

At League, we trust you to make honest and reasonable decisions about your role everyday, including what you do and how you do it. For example, we trust you to be sensible about the expenses you are incurring, spending League's money as if it were your own. Please review our Expenses & Work Travel Policy for more information.

## We are ethical

**We believe in ethics at every phase.**

We believe in achieving our mission with business practices that align with League's standards, values, and principles. Leaguers of all levels need to consistently maintain an ethical stance. Leaguers will avoid the intent and appearance of unethical or compromising practice in relationships, actions and communications. Unauthorized disclosure or use of company trade secrets or  marketing, operational, personnel, financial, source code, and technical information which is integral to the success of our company will not be tolerated.

**We make ethical decisions.**

Employees should consider the following questions when any behavior is questionable:

- Is the behavior legal?
- Does the behavior comply with all appropriate League policies?
- Does the behavior reflect League values and culture?
- Could the behavior adversely affect company stakeholders?

- Would I feel concerned if the behavior appeared in a news headline?
- Could the behavior adversely affect League if all employees did it?

For business decisions that raise potential ethical concerns, League's Ethical Decision Making Framework will be used by Legal and Compliance to determine the most ethical outcome to choose.

**We use AI ethically.**

We believe artificial intelligence (AI) has the potential to revolutionize the way we live and work. However, we also recognize that AI can be used in ways that are unethical or harmful. That's why we have developed a set of expectations for the ethical use of AI at League. At League this means taking a safe, secure, humane, and environmentally friendly approach to AI.

We believe that these expectations are essential for ensuring that AI is used in a responsible and ethical way at League. Our Use of Generative (GenAI) Tools Policy outlines our commitment to using artificial intelligence safely.

## Reporting Violations & Non-Retaliation

### Reporting Violations

Incidents that violate this Code of Conduct and related Policies can be very damaging to League, to our customers, our partners, our investors, and to our employees.

**If you know or suspect that anyone at League has engaged in conduct that violates a law, regulation, this Code or any Policies within, you have a duty to report it right away.**

**You can submit questions or report your concern to your Manager, your HR Business Partner, or any member of the Senior Leadership Team that you are comfortable with.**

**If you need to report an activity that is illegal, unethical or dishonest, you can do so by submitting it to our whistleblower hotline.** For more information on what constitutes misconduct, and how to report it, please read our Whistleblower Policy.

Please note that Policy violations may result in legal, punitive or corrective action, up to and including termination of employment and/or criminal prosecution. For more information, please visit the Code Of Conduct Violation Policy.

### Non-Retaliation

We want you to feel safe to speak up about any concerns or misconduct to your manager, any other manager at League, the People & Culture Team, or otherwise in accordance with the Whistleblower Policy. We rely on every Leaguer to take this responsibility, and our goal

is always to resolve problems as quickly as possible so that we all can continue to do great work. If you report something you suspect violates this Code, our policies, or the law, it is utterly forbidden for League to retaliate against you in any way.

We ask that you only raise concerns in good faith. "In good faith" doesn't mean you have to be right, or that you're even sure that a violation has occurred, it just means that you believe whatever you report is truthful.

**Non-Disparagement**

During the term of your employment with League and thereafter, you will not make any disparaging remarks, or any remarks that could reasonably be considered disparaging regarding League or its employees, stakeholders, representatives, business operations and practices.

## Review of Code

This Code of Conduct is reviewed annually by the Executive Team, the People & Culture Team, and Legal & Compliance Team. You can find a full list of policies that make up League's Code of Conduct on the next page, we encourage you to review them individually. If any major changes to policies are made, you will be notified of and required to acknowledge them.

## Appendix - Code Review History

| Version | Date | Author | Revision |
|---------|------|--------|----------|
| 1.0 | 2018-09-04 | Director, People Initiatives (Signy Roland) | First version |
| 1.1 | 2018-09-05 | CEO (Michael Serbinis) | Review and approval. |
| 1.2 | 2019-08-26 | Director, People & Culture (Signy Roland) | Annual review. Minor changes: updated with 2019 policy updates. |
| 1.3 | 2020-08-21 | Director, People & Culture (Signy | Annual review. New policies |

|  |  | Roland) | added and existing policies updated. |
|---|---|---|---|
| 1.4 | 2021-08-18 | Associate, People & Culture (Anne Orr) | Annual review. Existing policies updated. |
| 1.5 | 2021-08-19 | Director of People & Culture Operations (Rosie Papic) | Final annual review. |
| 1.6 | 2022-08-09 | AVP, Total Rewards & People Operations (Rosie Papic) | Annual review. Minor edits and existing policies updated. |
| 1.7 | 2023-06-05 | People & Culture Coordinator (Tanya Mukhi) | Addition of passwords |
| 1.8 | 2023-06-22 | AVP, Total Rewards & People Operations (Rosie Papic) | Annual review. Minor edits, addition of new policies, and existing policies updated. |
| 1.9 | 2024-06-21 | Director, HRIS & People Operations | Additional policies added to appendix, updated channels for feedback, removed deprecated policies. |
| 2.0 | 2024-06-30 | VP, Total Rewards & People | Annual Review. Added Ethics section. |

| | | Operations (Rosie Papic) | |
| --- | --- | --- | --- |
| 3.0 | 2025-06-30 | VP, People (Rosie Papic) | Annual review & sign-off. |

## Appendix - **All Policies are located here**